IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

UNITED STATES OF AMERICA,

v.  Criminal Action No. 2:19cr109

JORGE BELLO FUENTES,
         Defendant.

## MEMORANDUM OPINION

This matter comes before the Court on Jorge Bello Fuentes's second motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i). (ECF No. 286.) Bello Fuentes requests that the Court "grant him a full release, or in the alternative place him on supervised release or home detention for the remainder of his sentence." (*Id.* at 15.) He asserts that he is entitled to such relief because of an unwarranted sentencing disparity between co-defendants in his case. (*Id.* at 6–7.) He also contends that his health issues combined with the ongoing Coronavirus 19 Pandemic ("COVID-19") support his release. (*Id.* at 7–9.) Third, he argues that, for a variety of reasons, the current conditions of his confinement are more severe than the court could have anticipated when it sentenced him. (*Id.* at 9–12.) Finally, Bello Fuentes asks that the Court consider his "clean disciplinary record" and the "ample family support" waiting for him upon his release. (*Id.* at 7.) The government opposes his motion. (ECF No. 297.)

Because Bello Fuentes does not establish an extraordinary and compelling reason warranting relief and the 18 U.S.C. § 3553(a) factors do not support his release, the Court will deny his motion.

### I. BACKGROUND

Throughout the spring of 2018, Bello Fuentes and his co-conspirators installed skimming

devices on multiple gasoline pump card-readers in the Eastern District of Virginia and elsewhere. (ECF No. 107, at 1–2; *see also* ECF No. 253, at 4–7.) Using the skimmers, the conspirators gained access to the bank, credit, and debit card account information of unwitting customers. (ECF No. 107, at 2.) The conspirators then used that information to make unauthorized purchases, withdrawals, and transfers totalling at least $103,778.92 from 149 victims. (ECF No. 253, at 7.) Notably, Bello Fuentes installed and maintained many of the portable card reading devices. (ECF No. 107, at 2; *see also* ECF No. 296, at 1 (explaining that but for Bello Fuentes's actions, the conspirators "would not have been able to participate in the instant offense").)

On September 18, 2019, the grand jury returned a seventeen-count superseding indictment charging Bello Fuentes with conspiracy to commit bank fraud (Count One), bank fraud (Counts Two through Ten), and aggravated identity theft (Counts Eleven through Seventeen). (ECF No. 27.) On January 8, 2020, Bello Fuentes pleaded guilty to conspiracy to commit bank fraud (Count One) and one count of aggravated identify theft (Count Eleven). (ECF Nos. 105, 106.) In exchange, the government agreed to dismiss the fifteen additional charges against him. (*See* ECF No. 168.)

At Bello Fuentes's sentencing, the Court calculated an advisory guideline range of fifty-one to sixty-three months' imprisonment on Count One, plus a mandatory twenty-four-month consecutive sentence on Count Eleven. (*See id.*; ECF No. 253, at 20.) Bello Fuentes's clean record resulted in a criminal history category of one,[1] but his criminal activity produced an offense level

---

[1] Although he had no prior convictions, Bello Fuentes was on bond awaiting trial for allegedly stealing and using credit card information in Illinois at the time he was arrested for the instant offenses. (ECF No. 162, at 8; *see also* ECF No. 253, at 10–11.) According to the government, Bello Fuentes made a living by "travel[ing] around the country placing skimmers and stealing credit card account numbers with different combinations of conspirators" for a period of years. (ECF No. 164, at 9.)

of twenty-four.[2] (*Id.* at 20.) On July 17, 2020, the Court varied downward on Count One and imposed a total sentence of sixty months' imprisonment. (ECF Nos. 168, 171.) On February 11, 2021, Bello Fuentes moved this Court to grant him compassionate release based on the COVID-19 pandemic and his health conditions. (ECF No. 250.) The Court denied his motion on June 4, 2021, (ECF No. 261, at 5),[3] and on November 1, 2021, he filed the instant motion for compassionate release, (ECF No. 286).

In his motion, Bello Fuentes raises several new arguments in favor of his release and renews the COVID-19-based argument proffered in his previous motion. As for his new arguments, Bello Fuentes first asserts that the Court sentenced him more harshly than his similarly situated co-defendants. (*Id.* at 6–7.) Second, he argues that his transfer to Federal Correctional Institute McDowell ("FCI McDowell") in Welch, West Virginia, has exposed him to many extraordinary hardships: including (1) a lack of Spanish-speaking staff or programing; (2) the use of COVID-19 spread reduction measures such as solitary confinement; (3) his distance from his home and family; (4) a lack of proper medical care; (5) "extreme violence[,] . . . gang [activity,] . . . [and] . . . drug abuse" within his prison; (6) and various other conditions which "pose[] an inordinate danger to his health and safety." (*Id.* at 9–12.)

---

[2] Bello Fuentes received multiple enhancements because his offense involved more than ten victims, the use of unauthorized access devices, and sophisticated means, the amount of loss as calculated under the guidelines exceeded $550,000, and he participated in relocating the scheme to another jurisdiction to evade law enforcement. (ECF No. 253, at 13–15.) He also received a three-point offense level reduction for acceptance of responsibility. (*Id.* at 15.)

[3] In its denial, the Court concluded that Bello Fuentes demonstrated neither particularized susceptibility to COVID-19 nor particularized risk of contracting the virus and that a sentence reduction would not afford adequate deterrence to Bello Fuentes or others contemplating this sort of scheme. (*Id.*)

3

## II. LEGAL STANDARD

Section 3582(c)(1)(A), as amended by the First Step Act, authorizes a district court to modify a criminal defendant's sentence if "after considering the factors set forth in [18 U.S.C. §] 3553(a) to the extent that they are applicable, [] it finds that . . . extraordinary and compelling reasons warrant such a reduction . . . and that such reduction is consistent with applicable policy statements . . . ."[4] 18 U.S.C. § 3582(c)(1)(A). Today, § 3582(c)(1)(A) allows a defendant to seek relief directly from the Court after he has "fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on [his] behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." *United States v. Feiling*, 453 F. Supp. 3d 832, 837 (E.D. Va. 2020).

Congress did not define extraordinary and compelling reasons in § 3582(c)(1)(A). "Instead, the Sentencing Commission . . . addressed the issue in a policy statement, United States Sentencing Guideline § 1B1.13." *United States v. McCoy*, 981 F.3d 271, 276 (4th Cir. 2020). Following the passage of the First Step Act, however, the Sentencing Commission failed to update § 1B1.13 to account for motions filed by defendants. *Id.* at 281. As a result, the policy no longer binds courts presented with a defendant's motion for compassionate release. *Id.* Accordingly, a Court may "consider *any* extraordinary and compelling reason for release that a defendant might raise." *Id.* at 284 (quoting *United States v. Brooker*, 976 F.3d 228, 230 (4th Cir. 2020)) (emphasis in original). During the COVID-19 pandemic, "courts have found extraordinary and compelling

---

[4] Absent extraordinary and compelling reasons, a district court may modify a defendant's sentence if "the defendant is at least 70 years of age, has served at least 30 years in prison" for a sentence imposed under 18 U.S.C. § 3559(c), and the Director of the Bureau of Prisons ("BOP") has determined "that the defendant is not a danger to the safety of any other person or the community." 18 U.S.C. § 3582(c)(1)(A)(ii). These circumstances do not apply to Bello Fuentes.

4

reasons for compassionate release when an inmate shows both a particularized susceptibility to the disease and a particularized risk of contracting the disease at his prison facility." *Feiling*, 453 F. Supp. 3d at 841.[5] Yet, despite the discretionary nature of compassionate release, the "extraordinary and compelling reasons" standard "set[s] an exceptionally high [bar] for relief." *McCoy*, 981 F.3d at 288; *see also United States v. Landry*, No. 2:16cr171, 2021 WL 5493497, at *2 (E.D. Va. Nov. 22, 2021) ("It is settled that the burden is on the defendant to prove that extraordinary and compelling reasons exist for compassionate release.").

### III. DISCUSSION

#### A. Administrative Exhaustion

"By its plain language, § 3582(c)(1)(A) requires defendants to first exhaust administrative remedies or wait thirty days after requesting that the warden of their facility file a motion for a sentence reduction. . . ." *Feiling*, 453 F. Supp. 3d at 837. The exhaustion requirement is non-jurisdictional, however, "and thus waived if it is not timely raised" by the government. *United States v. Muhammad*, 16 F.4th 126, 127, 129–30 (4th Cir. 2021).

Bello Fuentes requested compassionate release from the acting warden of FCI McDowell on August 31, 2021.[6] (ECF No. 286, at 6; ECF No. 286-1.) The warden denied his request on September 7, 2021. (ECF No. 296, at 2.) Because Bello Fuentes filed his motion with the Court more than thirty days after filing his request with the warden, and the government does not

---

[5] *See also United States v. High*, 997 F.3d 181, 185 (4th Cir. 2021) ("The underlying arguments for release from prison based on the coronavirus pandemic depend at least on allegations that the risk of contracting COVID-19 in prison is higher than the risk outside the prison and that the inmate's preexisting medical condition increases that individual's risk of experiencing a serious, or even fatal, case of COVID-19.").

[6] In that request, he raised many of the same issues presented in his current motion before the Court but failed to allege a sentencing disparity between co-defendants.

5

challenge that he has satisfied the statutory exhaustion requirement, the Court finds that he has exhausted his administrative remedies and will proceed to the merits of his motion. *See Muhammad*, 16 F.4th at 131 ("[T]he threshold requirement in § 3582(c)(1)(A) is . . . satisfied if a defendant requests the [BOP] to bring a motion on their behalf and *either* fully exhausts all administrative rights to appeal the B[OP]'s decision *or* waits 30 days from the date of their initial request to file a motion in the district court." (emphasis in original)). *But see Feiling*, 43 F. Supp. 3d at 840.

### B. *Extraordinary and Compelling Reasons*

Bello Fuentes's motion presents a litany of "causes" for the Court's consideration. (ECF No. 286, at 6.) District courts within the Fourth Circuit are empowered to consider a wide range of arguments in favor of relief, including the aggregate of multiple factors. The Court finds, however, that the defendant's motion presents little more than a handful of undeveloped allegations thrown at the proverbial wall in an effort to see what "sticks." As explained below, Bello Fuentes fails to present a freestanding extraordinary and compelling reason for release. Additionally, the Court finds that his many grievances, even when combined, do not satisfy the high threshold necessary for relief.

#### 1. *Sentencing Disparity*

In certain circumstances, a disparity between a defendant's sentence and the sentence he or she would receive if sentenced under current law may amount to an extraordinary and compelling reason for relief. *See, e.g., McCoy*, 981 F.3d at 274 (affirming the district court's decision to grant compassionate release based, in part, on the 200-month disparity between the length of defendant's original sentence and the sentence provided for under the First Step Act). But Bello Fuentes does not argue that his sentence is disproportionate to the sentence he would

6

receive today. Rather, he claims that his sentence is unnecessarily harsh when compared to those of his co-conspirators.[7] The Court need not consider whether an unwarranted disparity of sentences between co-defendants would amount to an extraordinary and compelling reasons for relief because,[8] despite Bello Fuentes's conclusory assertions to the contrary, no such disparity exists. To explain why *this* defendant's claim lacks merit, the Court will briefly explain its role in crafting a defendant's ultimate sentence.

In sentencing any defendant, the Court "must make an individualized assessment based on the facts presented." *Gall v. United States*, 552 U.S. 38, 50 (2007). To do so, the Court begins all sentencing proceedings by calculating the applicable sentence range under the Federal Sentencing Guidelines. *Id.* at 49; *see also* U.S.S.G. §§ 1B1.1, 1B1.2. The Guidelines assign each offense a numerical base offense level. The Court then alters or adjusts the defendant's base offense level to account for, among other things, the specific characteristic of the offense, certain characteristics of the victims, the defendant's specific level of involvement in the crime, or the defendant's acceptance of responsibility. The Guidelines also employ a criminal history score.[9] Based on that score, the Court determines a defendant's criminal history category. Combined, the offense level

---

[7] Insofar as Bello Fuentes seeks to challenge the underlying validity of his sentence, the Court rejects his argument. *See United States v. Morris*, No. 4:13cr25, 2022 WL 1285183, at *1 (E.D. Va. Apr. 29, 2022) (explaining that "a compassionate release motion is not an opportunity to challenge <u>the validity</u> of an inmate's long-final sentence" (emphasis in original)).

[8] *But see United States v. Eccleston*, 573 F. Supp. 3d 1013, 1018 (D. Md. 2021) (granting compassionate release based on sentencing disparity between co-conspirators).

[9] The Court examines prior criminal sentences in computing an individual's criminal history score. The calculation accounts for the length of prior sentences and factors such as whether a prior offense was violent or committed while the defendant was under an existing criminal justice sentence. The calculation also discounts some sentences imposed more than fifteen years prior to the commencement of the instant offense, those imposed while the individual was a juvenile, and sentences that have been expunged. *See* U.S.S.G. § 4A1.1.

7

and the criminal history category provide the Court with a sentencing guidelines range. U.S.S.G. § 5A. Although the guidelines range is advisory, some crimes, such as aggravated identity theft, carry mandatory statutory sentences. *See* 18 U.S.C. § 1028A(a)(1); (ECF No. 253, at 20.) Further, "[t]he Guidelines are not the [sentencing court's] only consideration." *Gall*, 552 U.S. at 49. Rather, the court contemplates both parties' sentence recommendations and the § 3553(a) sentencing factors to craft a sentence that is "sufficient, but not greater than necessary" to accomplish the goals of sentencing.[10] *Id.* § 3553(a).

Bello Fuentes served a critical role in a conspiracy involving *six* now-convicted co-defendants.[11] In his motion, Bello Fuentes selectively identifies three co-conspirators who received lighter sentences: Yariel Monsibaez Ruiz, Pedro Emilio Duran, and Guillermo Bello Fuentes.[12] (ECF No. 286, at 6–7.) None of these defendants received disparately more lenient sentences than Bello Fuentes. Ruiz and Duran each pleaded guilty only to conspiracy.[13] Bello Fuentes pleaded guilty to conspiracy *and* identity theft and was thus subject to an additional, mandatory twenty-four-month sentence. *See* 18 U.S.C. § 1028A(a)(1). Further, both Ruiz and Duran received a lesser enhancement under U.S.S.G. § 2B1.1(b)(1) because they were attributed

---

[10] Sentencing is an individualized assessment, but the Court must consider "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).

[11] *Compare* ECF No. 3 (criminal complaint), *with* ECF No. 27 (first superseding indictment), *and* ECF No. 112 (second superseding indictment).

[12] Although Bello Fuentes fails to mention him, the Court notes that Luis Miguel Fernandez Cardente is the most appropriate comparator for Bello Fuentes. Both men pleaded guilty to the same crimes, and their adjusted offense levels and criminal history scores were identical. (ECF No. 222, at 17–19). The Court sentenced Cardente to four months more than Bello Fuentes. (ECF No. 237.)

[13] Ruiz and Duran had criminal history categories identical to Bello Fuentes.

smaller financial losses and fewer victims than Bello Fuentes.[14] Unsurprisingly, these differences resulted in lower guideline ranges and thus lower sentences.[15]

Bello Fuentes next argues that his sentence is unfair relative to Guillermo Bello Fuentes's ("GBF"). Bello Fuentes and GBF both pleaded guilty to conspiracy and identity theft. GBF's sentencing guideline range was lower than Bello Funetes's, however, because he received a lesser enhancement under § 2B1.1(b)(1) than Bello Fuentes. (ECF No. 193, at 13.) Despite this difference, Bello Fuentes laments that the two men's sentences are disparate because, unlike GBF, Bello Fuentes had "no prior record for fraud." (ECF No. 286, at 6.) First, this argument ignores that GBF had the same criminal history category as Bello Fuentes. (*See* ECF No. 193, at 15–17, 22.) Further, although Bello Fuentes had no prior convictions, the Court considered that Bello Fuentes was on bond awaiting trial for similar crimes at the time he was arrested for the instant offenses.[16] (ECF No. 253, at 16.) Indeed, despite his looming trial, "when the defendant was arrested on the instant case in St. Louis, he was found cashing out stolen credit cards with additional stolen credit card numbers." (ECF No. 297, at 18.) In the end, Bello Fuentes's

---

[14] *Compare* (ECF No. 177, at 12; ECF No. 194, at 13 (enhancing Duran and Ruiz's offense levels by 10 for attributed losses between $150,000 and $250,000)), *with* (ECF No. 253, at 13 (enhancing Bello Fuentes's offense level by 14 for attributed losses between $550,000 and $1,500,000)).

[15] The Court sentenced Duran to thirty months' imprisonment. (ECF No.186, at 1). The Court sentenced Ruiz to nineteen months, (ECF No. 214, at 1), but Ruiz had already served an eleven-month North Carolina state sentence stemming from the same offense and events, (ECF No. 215, at 3). Combined, his federal and state sentences subjected Ruiz to approximately the same punishment as Duran.

[16] Authorities arrested Bello Fuentes on March 30, 2019, in Illinois and charged him with unlawful altering of a credit or debit card, identity theft, using a forged credit or debit card, and three counts of fraudulent use of electronic submissions.

9

conspiracy guideline range was 51-63 months,[17] as compared to GBF's range of 41-51 months, and the Court granted similar downward variances in both cases.[18] Further, the Court ran both defendant's identity theft sentences consecutive to his conspiracy time.

Simply put, Bello Fuentes's sentence reflects both the bargained-for terms of his plea agreement and the Court's assessment of his culpability relative to his many co-defendants. Accordingly, the Court finds that Bello Fuentes's sentence is not disparate relative to the sentences of his co-conspirators and patently does not amount to an extraordinary and compelling reason for relief.

### 2. *Elevated Risk of COVID-19*

Bello Fuentes next argues that his medical conditions combined with the global COVID-19 pandemic justify his release. (*See* ECF No. 286, at 7–9; *cf.* ECF No. 261 (rejecting similar arguments).) Courts around the country have found that compassionate release may be appropriate when an inmate demonstrates both that (1) "the inmate's preexisting medical condition increases that individual's risk of experiencing a serious, or even fatal, case of COVID-19"—or particularized susceptibility—and (2) "the risk of contracting COVID-19 in a prison is higher than the risk outside the prison"—or particularized risk.[19] *High*, 997 F.3d at 185. Bello Fuentes

---

[17] Including the mandatory twenty-four-month sentences for aggravated identity theft, GBF's sentencing guideline was 65–75 months and Bello Fuentes's sentencing guideline was 75–80 months. (ECF No. 193, at 22; ECF No. 253, at 20.)

[18] For conspiracy, the Court sentenced GBF to twenty-three months' imprisonment or 18 months below the low end of his guidelines. Similarly, the Court sentenced Bello Fuentes to thirty-six months' imprisonment or 15 months below his minimum guideline. (ECF No. 216, at 2; ECF No. 171, at 2.)

[19] "In assessing whether the record shows the existence of extraordinary and compelling reasons for compassionate release, courts consider, *inter alia*, the guidance of the [Centers for Disease Control & Prevention ("CDC")] . . . ." *United States v. Thompson*, No. 3:19cr76, 2021 WL 2673049, at *2 (E.D. Va. June 29, 2021).

establishes neither.

### i. Particularized Susceptibility

Bello Fuentes contends that his kidney stones, liver problems, and lingering symptoms of COVID-19 make him particularly susceptible to severe illness should he contract COVID-19 again.[20] (ECF No. 286, at 7, 9.) The government argues that Bello Fuentes does not establish that he faces particularized susceptibility to COVID-19 because: (1) Bello Fuentes's medical conditions do not place him at greater risk of severe illness from COVID-19; (2) he provides no evidence that he *in fact* suffers from those medical conditions; and (3) he has been fully vaccinated.[21] (ECF No. 297, at 11–12.) The Court agrees with the government.

The CDC does not list kidney stones as a condition that places an individual at an elevated risk of serious illness or death should they contract COVID-19.[22] Bello Fuentes does not explain the nature of his liver problems,[23] and his medical records provide no clarity. Without a diagnosis

---

[20] Bello Fuentes contracted COVID-19 in September 2020 while incarcerated at the Pamunkey Regional Jail. Bello Fuentes claims that he experiences lingering effects of the virus today, including "breathing problems, . . . loss of taste and smell," and swelling of his liver, (ECF No. 286, at 9), but he provides no evidence of these issues. Indeed, although the medical records that Bello Fuentes attached to his original motion for compassionate release reflect that he has received treatment for a variety of ailments including a sprained wrist injured while playing basketball, kidney stones, and constipation, the Court finds no support for his claims that he suffers from ongoing symptoms of COVID-19. To the contrary, Bello Fuentes's numerous lab panels, assessments, and examinations reflect that, as of early 2021, he was an "essentially healthy male." (*See* ECF No. 251, at 44.)

[21] Bello Fuentes received his first dose of the Pfizer-BioNTech vaccine on April 6, 2021, and his second dose on April 27, 2021. (ECF No. 297, at 7; *see also* ECF No. 296, at 2.)

[22] *See Science Brief: Evidence Used to Update the List of Underlying Medical Conditions Associated with Higher Risk for Severe COVID-19*, Ctrs. for Disease Control & Prevention, https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/underlying-evidence-table.html (last visited Aug. 8, 2022).

[23] The Court notes that certain chronic liver diseases can make a person more likely to get severely ill from COVID-19. *See People with Certain Medical Conditions*, Ctrs. For Disease Control & Prevention, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-

11

and information regarding the status of a defendant's condition, the Court cannot meaningfully assess the effect of such a condition on a defendant's susceptibility. Further, the Court finds that any enhanced susceptibility that Bello Fuentes may face on account of his *documented* health issues is largely mitigated by his vaccination status.[24] Accordingly, Bello Fuentes fails to show that he is particularly susceptible to COVID-19 reinfection.[25]

### ii. Particularized Risk

Bello Fuentes also fails to demonstrate that he faces a particularized risk of contracting the virus while housed at FCI McDowell. Bellow Fuentes contends that COVID-19 is worse at FCI McDowell than public information suggests, but he offers speculation and conclusory statements

---

precautions/people-with-medical-conditions.html (last visited Aug. 8, 2022). Bello Fuentes bears the burden to explain his condition *and* establish that such condition renders him particularly susceptible to serious illness or death from COVID-19.

[24] Although the Court cannot predict a vaccine's expected efficiency with regard to each new variant of the virus, CDC reports indicate that "[w]hen people who have been vaccinated [do] get COVID-19, they are much less likely to experience severe symptoms than people who are unvaccinated." *COVID-19 after Vaccination: Possible Breakthrough Infection*, Ctrs. for Disease Control & Prevention, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/effectiveness/why-measure-effectiveness/breakthrough-cases.html (last visited Aug. 8, 2022).

[25] Bello Fuentes also argues that his pending immigration detainer weighs in favor of compassionate release. (ECF No. 286, at 11; ECF No. 296, at 2.) The Court disagrees. While Bello Fuentes may indeed spend time in ICE custody waiting for his immigration status to be resolved, he fails to demonstrate that the risk of contracting COVID-19 in ICE custody is less than in FCI McDowell. This point thus weighs against compassionate release. *See, e.g.*, *United States v. Richiez-Castillo*, No. 00cr54, 2021 WL 1746426, at *7 (W.D.N.Y May 4, 2021) (finding that defendant's "transfer to immigration custody" would pose "equal or greater" exposure to COVID-19 than prison) (quoting *United States v. Beras*, No. 99cr75, 2020 WL 7496354, at *3 (S.D.N.Y. Dec. 20, 2020). Additionally, the Court finds that hypothetical future hardship attendant to any overcrowding in ICE custody does not amount to an extraordinary and compelling reason for release. *See, e.g.*, *United States v. Wilkes*, No. 2:03cr161, 2022 WL 1102630, at *4 (E.D. Va. Apr. 13, 2022) (concluding that hardships incidental to incarceration do not create an extraordinary and compelling reason for release).

rather than evidence to support his claims.[26] (ECF No. 286, at 8–9, 11.) Conversely, the government argues that BOP measures—offering vaccinations, quarantining ill inmates, and restricting movement within prisons—continue to effectively contain the spread of the coronavirus within FCI McDowell. (ECF No. 297, at 4–6, 14.)

Bello Fuentes acknowledges that the BOP: (1) distributes and incentivizes vaccinations[27]; (2) has protocols for isolating inmates who are ill with COVID-19; and (3) enforces social distancing through modified lockdowns. (*See* ECF No. 286, at 8–10; *see also* ECF No. 286-1.) Indeed, Bello Fuentes's argument is largely hamstrung by the existence of the very COVID-19 spread reduction measures that he seeks to challenge. *See infra* pp. 14–16. Furthermore, the available data indicates that such reduction measures are working[28]: as of August 8, 2022, only one inmate is confirmed positive for COVID-19 at FCI McDowell, and Bello Fuentes has

---

[26] For example, Bello Fuentes argues that FCI McDowell has offered various incentives to prisoners who volunteer for vaccination and concludes that such incentives show that "presumably" the inmate vaccination rate is low. (ECF No. 286, at 8.) Similarly, he says that a recent lockdown "reportedly[ occurred] because inmates are refusing to wear face masks." (*Id.*; ECF No. 286-1, at 8–12.) Bello Fuentes also asserts that FCI McDowell's published infection rates are low because infected inmates "hide infection from medical staff" to avoid quarantine (ECF No. 286, at 8–9). The Court notes, however, that other portions of Bello Fuentes's motion appear to directly contradict this theory. (*See id.* at 10–11 and ECF No. 323, at 2 (asserting that inmates are subject to modified operations "akin to solitary confinement" *regardless of infection status*).

[27] The Court calculates the inmate vaccination rate at FCI McDowell as between sixty and seventy percent. The government asserts that FCI McDowell has 1,074 vaccinated inmates out of a total of 1,590. (ECF No. 297, at 7.) The BOP website, (*see infra* note 29), states that FCI McDowell currently houses 1,528 inmates.

[28] *See COVID-19*, BOP, https://www.bop.gov/coronavirus/ (last visited Aug. 8, 2022). Reflecting zero active cases of COVID-19 among staff, one active case among inmates, and, to date, zero inmate or staff deaths. *Id. But see FCI McDowell*, BOP, https://www.bop.gov/locations/institutions/mcd/ (last visited Aug. 8, 2022) (listing FCI McDowell as a self-determined "Level 3" facility).

13

consistently tested negative for COVID-19 since arriving there.[29]

Because Bello Fuentes demonstrates neither a particularized susceptibility nor a particularized risk of contracting COVID-19 at FCI McDowell, he is not entitled to compassionate release on these grounds.

### 3. *Conditions of Confinement*

Next, Bello Fuentes argues that ongoing COVID-19 spread reduction measures and the general conditions at FCI McDowell have made his confinement so harsh as to justify his release. For the foregoing reasons, the Court disagrees.

#### i. Effects of COVID-19 protocols on conditions of confinement

District courts within the Fourth Circuit are empowered to consider any grounds for compassionate release that a defendant might raise. *See, e.g., United States v. Graham*, No. 21-6613, 2022 WL 1172169, at *1–2 (4th Cir. Apr. 20, 2022) (vacating and remanding district court's rejection of motion for compassionate release because the court failed to evaluate all of the defendant's arguments, including poor prison conditions). But just because a court must consider any argument, does not mean that a court must accept any argument. Bello Fuentes says that BOP COVID-19 protocols have made his prison experience substantially more punitive than the Court could have predicted when it imposed his original sentence.[30] (*Id.*) This simply is not so.

Throughout the pandemic, the BOP has modified operations to reduce the spread of COVID-19. Such modifications include medically isolating inmates who are symptomatic or test

---

[29] The probation office reports that Bello Fuentes tested negative for COVID-19 on his transfer to FCI McDowell on January 25, 2021, and in at least one subsequent test on March 24, 2021. (ECF No. 296, at 2.)

[30] He claims, for example, that he has spent "significant periods of time" in solitary confinement through "no fault of his own." (ECF No. 286, at 10–11.)

positive for COVID-19 and limiting inmate movements within the prison to promote social distancing. (ECF No. 297, at 4–5.) Although these realities undoubtedly exacerbate the punitive aspects of incarceration, they generally apply to every prisoner within a given facility and are neither unique to Bello Fuentes nor extraordinary in the broader context of the global pandemic. Perhaps unsurprisingly, district courts within the Fourth Circuit have found that such conditions do not warrant compassionate release.[31] Courts generally acknowledge that "[i]t would complicate sentencing enormously to require that the length of every sentence vary by the conditions of confinement." *United States v. Drayton*, No. 1:09cr76-2, 2021 WL 4267306, at *6 (E.D. Va. Sept. 20, 2021) (quoting *United States v. Spano*, 476 F.3d 476, 479 (7th Cir. 2007)). Thus, sentencing courts act with the knowledge that inmates can face a range of conditions. And "[w]hile [courts] could not have foreseen a global pandemic, [they] certainly make sentencing determinations knowing how difficult incarceration can be." *Id.*

In Bello Fuentes's case, this Court originally sentenced him on July 17, 2020, during the early stages COVID-19 pandemic, and contemplated the possibility that COVID-19 would continue to affect prison conditions. The Court imposed a sentence it found sufficient but not greater than necessary with COVID-19 in mind. Further, the Court affirmed the length of Bello Fuentes's current sentence on June 4, 2021, when it denied his first motion for compassionate release. (ECF No. 261.) When it did so, the Court was specifically aware of the use of modified operational conditions like the ones Bello Fuentes challenges now. (ECF No. 251, at 5 & 5 n.4.)

---

[31] *See, e.g., Wilkes*, 2022 WL 1102630, at *4 (explaining that because every inmate in the BOP must deal with similar restrictions on movement, such conditions do not constitute an extraordinary and compelling reason for relief) *United States v. Thorne*, No. 3:13cr293, 2022 WL 1494994, at *2 (W.D.N.C. May 11, 2022) (same); *United States v. Hall*, No. CR JKB-04-0323, 2022 WL 2105975, at *3 (D. Md. June 10, 2022) (same).

## ii. Health and safety considerations at FCI McDowell

Bello Fuentes also relies on the general conditions of life at FCI McDowell. He argues that conditions there are unhealthy and unsafe, and that through "no fault of [his own]" he has been placed in a "far more dangerous prison" than he should have been.[32] (ECF No. 286, at 12, 9–10.) In support, Bello Fuentes cites outbreaks of H. Pylori and scabies, claims that he has suffered from a lack of medical care, and notes that he "may have been exposed to an[] inmate with [tuberculosis]." (*Id.* at 11–12.) Bello Fuentes also alleges rampant drugs use and inmate violence within the prison.[33] The Court finds that these arguments lack merit.

Prisons must provide humane conditions of confinement, where inmates receive adequate food, clothing, shelter, and medical care, and prison officials "take reasonable measures to

---

[32] Bello Fuentes served the first portion of his sentence in Moshannon Valley Correctional Facility, a low security level prison. *See Moshannon Valley CI*, BOP, https://prisonerresource.com/federal-bureau-prisons/pennsylvania/#h-moshannon-valley-ci (showing security level) (last visited Aug. 8, 2022). Following Moshannan Valley's closure in March 2021, Bello Fuentes was transferred to FCI McDowell, a medium security prison. *See Our Locations*, BOP, https://www.bop.gov/locations/list.jsp (last visited Aug. 8, 2022).

Bello Fuentes asserts that he does not belong in a medium security prison. (ECF No. 286, at 9–10.) But his transfer between facilities remains a normal aspect of incarcerations outside of this Court's scope of influence. *See, e.g., Hayes v. Thompson*, 726 F.2d 1015, 1016–17 (4th Cir. 1984) (noting that the placement and assignment of inmates into particular institutions are discretionary functions); *Sandin v. Conner*, 515 U.S. 472, 478 (1995) ("[T]ransfer to a maximum security facility, albeit one with more burdensome conditions, was 'within the normal limits or range of custody which the conviction has authorized the [government] to impose.'" (quoting *Meachum v. Fano*, 427 U.S. 215, 225 (1976)); *Olim v. Wakinekona*, 461 U.S. 238, 250–51 (1983) (discussing that inmates have no constitutional right to be housed in a particular institution, or at a particular custody level).

[33] Bello Fuentes also argues that the prison is unsafe because there was an incident of carbon monoxide poisoning. (*Id.* at 12.) While such an event presents a non-trivial concern, Bello Fuentes readily acknowledges that the prison personnel responded promptly, "rush[ing inmates and multiple staff] to area hospitals." (*Id.*) Because the defendant's own account reflects that the BOP responded swiftly and appropriately to remedy a serious incident, the Court finds that this argument weighs against a finding that the prison conditions at FCI McDowell are extraordinarily dangerous.

16

guarantee the safety of the inmates." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526–27 (1984)). Further, prison conditions that inflict unnecessary or wanton pain, or conditions that are grossly disproportionate to the severity of the crimes warranting imprisonment constitute cruel and unusual punishment and are not constitutional. *Rhodes v. Chapman*, 452 U.S. 337, 348–49, (1981). The Constitution, however, does not mandate comfortable prisons. *Id.* Prison conditions can be "restrictive and even harsh"; indeed, such conditions are often considered part of the penalty that criminal offenders pay for their offenses against society. *Id.* at 347; *see also Wilkes*, 2022 WL 1102630, at *4. Additionally, prison conditions that apply to all prisoners, rather than applying only to the prisoner in question, are not generally "extraordinary" under the ordinary meaning of the word. *See, e.g., Cotton v. United States*, No. 2:08cr87, 2022 WL 3050007, at *4 (E.D. Va. Aug. 2, 2022).

Bello Fuentes's allegations suffer from other fatal flaws. First, Bello Fuentes provides no evidence for his many claims.[34] Further, his medical records belie a lack of medical care while in BOP custody and indicate instead that he has received a variety of preventative health measures including screening for tuberculosis, cancer, and oral health, as well as vaccinations for both COVID-19 and the flu. (ECF No. 251).[35]

### 4. *Other Factors*

Finally, Bello Fuentes offers his clean disciplinary record as a justification for his release.

---

[34] Although the Court acknowledges the limited ability of pro se defendants like Bello Fuentes to gather evidence, it finds that mere allegations alone do not satisfy a defendant's burden of showing an extraordinary and compelling reason for relief based on prison conditions. Indeed, a holding to the contrary would invite every defendant to submit a never-ending list of prison grievances to the courts in the hope of gaining release. *See Landry*, 2021 WL 5493497, at *2.

[35] Neither Bello Fuentes nor the government provide current medical records. The Court notes, however, that Bello Fuentes laments receiving a lack of medical care as far back as 2020. (ECF No. 286, at 11.) The record before the Court clearly undermines his claims.

Mere rehabilitation alone is not a reason for compassionate release, but a court may consider a defendant's post-conviction conduct as one factor in granting relief. *See, e.g., United States v. Henriquez*, 1:15cr225-1, 2021 WL 5771543 at *5 (M.D.N.C. Dec. 6, 2021). Nevertheless, the Court finds that Bello Fuentes's post-sentencing conduct is hardly "extraordinary." *See Wilkes*, 2022 WL 1102630, at *7 ("Prisoners are supposed to follow the rules, take classes, work at a job, and otherwise attempt to improve themselves" while incarcerated.) (quoting *United States v. Logan*, 532 F. Supp. 3d 725, 735 (D. Minn. 2021)). Although the Court acknowledges that COVID-19 modifications may limit a defendant's ability to take classes or otherwise engage in traditional rehabilitative programming, this does not negate Bello Fuentes's burden of showing that his circumstances, including evidence of post-sentencing conduct, are extraordinary.

\*     \*     \*

In summary, the Court finds that Bello Fuentes fails to establish that he entitled to the relief he seeks. First, the Court finds that several of his proffered reasons for relief simply do not exist. *See supra* pp. 6–9 (finding a lack of sentencing disparity among co-defendants or elevated susceptibility to COVID-19). Second, the Court concludes that allegations of harsh prison conditions—whether the result of COVID-19 modifications or other factors—do not amount to extraordinary and compelling reasons for release as to this defendant. To the contrary, Bello Fuentes fails to provide evidence to establish the veracity of many of his claims or demonstrate why such conditions are exceptional as to him. Accordingly, having carefully reviewed the record and Bello Fuentes's arguments, the Court finds that he has not shown extraordinary and compelling grounds for compassionate relief.

### *C. Section 3553(a) Factors*

Even if Bello Fuentes established an extraordinary and compelling reason for relief, the

Court would still deny this motion because the § 3553(a) factors do not support his release.

Section 3553(a) requires that a district court impose a sentence that is "sufficient, but not greater than necessary" to accomplish the goals of sentencing. *Id.* Most relevant here, a sentence must "reflect the seriousness of the offense," "promote respect for the law," "provide just punishment for the offense," and "protect the public from further crimes of the defendant." *Id.* § 3553(a)(2). Reducing Bello Fuentes's sentence would serve none of these goals.

In support of his motion, Bello Fuentes asserts that he is a "socially conscious" person who "has a great love for America and genuinely regrets committing [his] crime[s]."[36] (ECF No. 286, at 13–14.) He also notes that he has a clean disciplinary record and argues that he will be better situated to pay restitution if released. The Court finds these arguments unpersuasive.

Bello Fuentes's crimes were serious and extensive. Indeed, following his Illinois arrest for related conduct in March 2019, Bello Fuentes made no effort to reform his ways. "[I]n August 2019, he was observed cashing out prepaid credit cards, [and at the time of his federal arrest] he had a credit card imprinter [and] possessed hundreds of stolen credit card numbers on his computer." (ECF No. 162, at 8.) Although his crimes were not violent in nature, financial crimes like the defendant's cause significant repercussions—both mental and financial—for the victims.

Turning to Bello Fuentes's current characteristics, the Court acknowledges his admission of remorse and commends him on his clean disciplinary record. The Court finds, however, that

---

[36] Bello Fuentes also "disputes the [Presentence Investigation Report] changes that occurred [two] weeks prior to sentencing that increased his theft amount . . . [and] . . . raised his guidelines range." (ECF No. 286, at 13.) He contends that he learned of these changes one hour before sentencing and would have challenged them had he been given the chance. (*Id.*) Because a compassionate release motion is not an appropriate vehicle to challenge the validity of an inmate's final sentence or raise claims of ineffective assistance of counsel, the Court declines to address this argument. *See Morris*, 2022 WL 1285183, at *1. The Court notes, however, that despite Bello Fuentes's attempt to rewrite history, he *in fact* challenged the added amount prior to sentencing, and the Court overruled his objection. (*See* ECF No. 160, at 2–6.)

nothing in the record suggests that Bello Fuentes is in any way different from the man who came before the Court just over two years ago. Indeed, although the amount of time served is not dispositive, the Court finds that so short a sentence would not sufficiently deter this defendant or others considering similar crimes. Finally, insofar at the defendant's pending detainer will not serve to protect the public from his future crimes, the Court finds that his original sentence of sixty months' imprisonment remains necessary to accomplish that goal as well.

## IV. CONCLUSION

The Court finds that Bello Fuentes has not demonstrated "extraordinary and compelling reasons" justifying compassionate release under 18 U.S.C. §3582(c)(1)(A). Further, the § 3553(a) factors do not support his release. Accordingly, the Court will deny his motion. (ECF No. 286.)

An appropriate Order shall accompany this Memorandum Opinion.

Date: 19 August 2022
Richmond, VA

/s/
John A. Gibney, Jr.
Senior United States District Judge